IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **MUKESH R. SHAH, M.D.,** | Case No. 2:16-cv-1124 |
| Plaintiff, | |
| v. | Judge Graham |
| **METROPOLITAN LIFE INSURANCE COMPANY,** *et al.,* | Magistrate Judge Deavers |
| Defendants. | |

## OPINION AND ORDER

This matter is before the Court on the Motion for Partial Summary Judgment of Defendants The Paul Revere Life Insurance Company and Metropolitan Life Insurance Company. (Defs.' Mot. Partial Summ. J., ECF No. 61). For the reasons that follow, Defendants' motion is **GRANTED**.

### I. Background

On September 10, 1991, New England Mutual Life Insurance Company issued an individual disability insurance policy to Plaintiff Dr. Mukesh Shah identified as Policy No. 191D218095 (the "Policy"). (Answer to Am. Compl. ¶ 5, ECF No. 27 at 174). Dr. Shah was an interventional cardiologist at the time he applied for the Policy. (Am. Compl. ¶ 16, ECF No. 13 at 132). Defendant Metropolitan Life Insurance Company ("Met Life") is the successor-in-interest to the Policy through its merger with New England Mutual Life Insurance Company. (Answer to Am. Compl. at ¶ 6, ECF No. 27 at 174). Defendant Paul Revere Life Insurance Company ("Paul Revere") is responsible for administering the Policy on Met Life's behalf. (*Id.* at ¶ 7). Met Life and Paul Revere proceed together and are collectively referred to as "Defendants."

Pursuant to the terms of the Policy, Defendants are obligated to pay certain benefits to Dr. Shah for loss due to "injury" or "sickness" until his sixty-fifth birthday. (Claim File, ECF No. 57-

1

1 at 784–95). Under the provisions of the "Lifetime Total Disability Benefit Rider" also purchased by Dr. Shah (the "Rider"), Defendants are further required to make benefit payments beyond Dr. Shah's sixty-fifth birthday if he suffered "total disability" prior to age 65 and such disability continued until age 65. (*Id.* at 800). The Rider provides that if Dr. Shah's disability is due to "injury," Defendants are obligated to pay him the Maximum Monthly Amount. (*Id.* at 786, 800). Whereas if Dr. Shah's disability is due to "sickness," Defendants are only obligated to pay him according to a certain factor, which is a fraction of the Maximum Monthly Amount determined by Dr. Shah's age at the time of his "total disability" due to "sickness." (*Id.* at 800). The Policy also recognizes that a disability may be caused by both "sickness" and "injury" and promises to pay the largest benefit available. (*Id.* at 791, ¶ 6.2).

Under the Policy, "injury" is defined as "accidental bodily injury sustained after the Date of Issuance and while Your Policy is in force." (*Id.* at 784, ¶ 1.5). "Sickness" is defined as "sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force. It includes Disability due to complications of pregnancy or childbirth. It includes Disability due to normal pregnancy or childbirth after You have been Disabled for 90 days." (*Id.* at 784, ¶ 1.6).

Dr. Shah first experienced symptoms in 2005, "especially in his left shoulder down to his left triceps area," (Defs.' Ex. E, ECF No. 62-5 at 5462) and "presented with a clinical history of left cervical radiculopathy with finger numbness and pain after playing golf" to his initial treating physician, Dr. Grandinetti. (Defs.' Ex. D, Grandinetti Aff. ¶ 4, ECF No. 62-4 at 5452). Dr. Grandinetti performed an MRI of Dr. Shah's cervical spine and concluded that Dr. Shah had a disk protrusion, joint spur, and foraminal narrowing in each of the C4-C5, C5-C6, and C6-C7 vertebrae. (*Id.* at ¶ 5). Another physician, Dr. Cibula, reviewed the MRI and Dr. Grandinetti's findings and

"stated that the MRI 'does show an ostephyte at C-6-7.'" (*Id.* at ¶ 7). Dr. Cibula further determined that Dr. Shah's condition was "mostly chronic, although certainly the history supports an acute inflammation superimposed on a chronic process." (*Id.*). Dr. Grandinetti later confirmed that Dr. Cibula's findings were consistent with his initial examination. (*Id.* at ¶ 9, 5453). A few weeks later, Dr. Uselman further assessed Dr. Shah and determined, "Dr. Shah does have a C6-7 disc herniation with a C7 radiculopathy." (ECF No. 62-5 at 5463).

On February 29, 2012, Dr. Shah sought treatment for bilateral shoulder pain. (Defs.' Ex. F, ECF No. 62-6 at 5465). Dr. Nowinski, a board-certified orthopedic surgeon, diagnosed Dr. Shah with bilateral rotator cuff tears, biceps tendon tears, and bilateral rotator cuff syndrome with impingement and acromioclavicular ("AC") joint arthropathy and recommended surgical treatment. (*Id.* at 5466). On March 2, 2012, Dr. Nowinski performed shoulder surgery on Dr. Shah's right side. (Defs.' Ex. G, ECF No. 62-7). In his operative report, Dr. Nowinski noted that Dr. Shah, "presents with the gradual onset of progressive pain and dysfunction of the right shoulder." (*Id.* at 5470). Following the initial surgery on his right side, Dr. Shah fell from a bicycle and fractured his left clavicle and dislocated his left AC joint. (Defs.' Ex. V, ECF No. 62-22 at 5541).

During the subsequent shoulder surgery on his left side in May 2012, his clavicle fracture and dislocated AC joint were also repaired. (*Id.*). Dr. Shah returned to work after the second surgery. (*Id.*). On July 30, 2012, Dr. Shah was reevaluated by Dr. Nowinski, who noted, "the clavicle is well healed." (Defs.' Ex. K, ECF No. 62-11 at 5479). During a second reevaluation on November 19, 2012, Dr. Nowinski once again noted that Dr. Shah's clavicle was, "well healed" and in "good alignment and position." (Defs.' Ex. L, ECF No. 62-12 at 5483).

On January 22, 2013, Dr. Shah saw Dr. Uselman for his neck pain. (Defs.' Ex. AC, ECF No. 62-29 at 5580). Upon reviewing Dr. Shah's MRI, Dr. Uselman noted, "neck pain with radiation into the left arm getting progressively worse." (*Id.*). Dr. Uselman recommended physical therapy treatment and an MRI of the cervical spine. (*Id.*). On September 6, 2013, Dr. Shah saw Dr. Flood, a rheumatologist, for severe neck and scapular pain. (*Id.* at 5581). Dr. Flood recommended an injection in Dr. Shah's left shoulder to treat his pain. (*Id.*). On September 9, 2013, an MRI showed degeneration in multiple areas of the cervical spine. (*Id.*). On September 10, 2013, Dr. Shah returned to Drs. Nowinski and Uselman. (*Id.*). Dr. Nowinski suggested he consider modifying his career, and Dr. Uselman recommended he stop doing interventional cardiology altogether. (*Id.*). On September 11, 2013, Dr. Shah saw Dr. Lang, a neurologist. (*Id.*). Dr. Lang also noted degenerative disk disease progression and bilateral issues exacerbated by Dr. Shah's work in the catheterization lab. (*Id.*).

On September 12, 2013, Dr. Shah became disabled due to shoulder and cervical spine pain and was unable to continue practicing as an interventional cardiologist. (Am. Compl. ¶ 17, ECF No. 13 at 132). On October 24, 2013, Dr. Shah gave notice of his condition and of a claim under the Policy to New England Mutual Life Insurance Company. (*Id.* at ¶ 15, ECF No. 3 at 61). On June 5, 2014, Defendants approved Dr. Shah's request for individual disability benefits and informed him that factors for "total disability" due to "sickness" may apply. (Defs.' Ex. T, ECF No. 62-20 at 5521–22). On July 7, 2014, Dr. Shah asked Defendants to confirm that his condition resulted from "injury" with lifetime benefits. (Defs.' Ex. U, ECF No. 62-21 at 5531).

On August 21, 2014, Paul Revere sent Dr. Shah's medical records to Dr. Beavers, who is board certified in internal medicine and occupational medicine. (Defs.' Ex. V, ECF No. 62-22 at 5535). After reviewing Dr. Shah's records, Dr. Beavers concluded that Dr. Shah's "condition of

4

cervical degenerative disc disease and radiculopathy is chronic and degenerative in nature and not related to any acute traumatic event." (*Id.* at 5442). On August 27, 2014, Dr. Beavers contacted Dr. Nowinski to discuss Dr. Shah's medical condition. (Defs.' Ex. W, ECF No. 62-23 at 5545). Dr. Beavers summarized their conversation by noting that Dr. Shah's clavicle and AC joint have healed and further stating that "Dr. Nowinski indicated that Dr. Shah's bilateral rotator cuff tears were pre-existing, chronic and degenerative generations." (*Id.* at 5543). Dr. Beavers also remarked that Dr. Shah's "present inability to work is related both to residual symptoms from the bilateral shoulder conditions and a recurrence of a pre-existing cervical radiculopathy, all of which are chronic, degenerative conditions and not related to an acute traumatic event." (*Id.*).

On October 7, 2014, Dr. Nowinski responded by providing a sworn declaration stating, "Dr. Shah's condition is related to injury, the cumulative effects of years of standing for long hours in the catheterization lab in ergonomically unsound positions while bearing the weight of heavy personal protective apparel, as complicated by his left clavicle fracture and surgery, which have led to his orthopedic problems." (Claim File, ECF No. 57-10 at 4861). On November 6, 2014, Paul Revere sent Dr. Shah's records to Dr. Kanovsky, a board-certified orthopedic surgeon, for further review. (Defs.' Ex. Y, ECF No. 62-25). On November 13, 2014, Dr. Kanovsky found that "Dr. Nowinski agreed that the condition is not related to any acute traumatic event, but now argues that his condition is related to 'the cumulative effects of years of' working in the catheterization lab." (*Id.* at 5552). Dr. Kanovsky further stated, "My conclusion was that the insured's condition of cervical degenerative disc disease and radiculopathy was chronic and degenerative in nature and not related to any acute traumatic event, and that, while this condition would be expected to be exacerbated by intensive and repetitive upper extremity activity, I do not conclude that these movements are traumatic or injurious." (*Id.*). Dr. Kanovsky opined, "There is not any evidence in

5

the medical records or articles submitted by the claimant that the lead aprons were the cause of the DDD cervical spine." (*Id.* at 5557). Dr. Kavonsky added, "the changes in the cervical spine are more likely than not the result of degenerative changes on a multifactorial basis and not the result of any specific trauma but can be exacerbated by the use of a lead apron (symptoms subsided when claimant did not do intervention procedures and rested)." (*Id.*).

While the subsequent medical reviews were underway, Paul Revere requested that its in-house counsel determine whether Ohio law recognizes damage caused by repetitive stress as an accidental bodily injury. (Defs.' Ex. Z, ECF No. 62-26 at 5559). On October 31, 2014, Paul Revere's counsel determined that "Ohio does not recognize repetitive stress injury as an 'accident'" and cited three cases for this proposition. (*Id.*). "Ohio recognizes an accident occurring based on a specific temporal event." (*Id.*). Counsel therefore concluded that an Ohio court would not consider harm to the insured from years of wearing a lead apron due to his occupation as an "accidental bodily injury" as defined in the Policy. (*Id.*).

On December 1, 2014, Defendants determined Dr. Shah was disabled due to "sickness." (Defs.' Ex. AA, ECF No. 62-27 at 5561). On March 23, 2015, Dr. Shah appealed Defendants' determination. (Defs.' Ex. AB, ECF No. 62-28 at 5568). On April 30, 2015, Dr. Moses, an orthopedic surgery specialist, reviewed Dr. Shah's medical records. (Defs.' Ex. AC, ECF No. 62-29). Dr. Moses determined the etiology of Dr. Shah's disabling condition as, "progressive degenerative changes of the cervical spine and shoulder that is exacerbated by repetitive use." (*Id.* at 5581). On May 6, 2015, following confirmation that Dr. Shah's medical condition was due to degenerative changes, Defendants reaffirmed their earlier determination that Dr. Shah was disabled due to "sickness." (Defs.' Ex. AD, ECF No. 62-30).

After receiving affirmation of Defendants' "sickness" determination, Dr. Shah filed suit against Defendants, asserting claims of breach of contract, declaratory judgment, and bad faith. (Am. Compl. ¶¶ 26, 32, 40, ECF No. 13 at 134–35). In asserting his bad faith claim, Dr. Shah contends that Defendants were not reasonably justified in determining and maintaining that his disability is due to "sickness" and not "injury." (*Id.* at ¶ 37, 135). On March 15, 2018, Defendants moved for partial summary judgment on Dr. Shah's claim of bad faith and his related claims for punitive damages and attorneys' fees. (ECF No. 61 at 1).

## II. Standard of Review

Defendants have moved for partial summary judgment under Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt,* 586 F.3d 459, 465 (6th Cir. 2009). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

A district court considering a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum,* 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *see Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009). "The central issue is 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Revis,* 489 F.3d at 279–80 (quoting *Anderson,* 477 U.S. at 251–52).

## III. Discussion

In the motion at bar, Defendants seek judgment in their favor on Dr. Shah's claim of bad faith and his related claims for punitive damages and attorneys' fees. (ECF No. 61 at 1). The Supreme Court of Ohio has determined that an insurance company does not act in bad faith in processing an insured's claim if the insurance company has a reasonable justification for denying coverage. *Zoppo v. Homestead Ins. Co.,* 71 Ohio St. 3d 552, 644 N.E.2d 397, 399–400 (Ohio 1994). An insurer lacks reasonable justification for its denial when its refusal to pay is predicated on an arbitrary and capricious belief that the insured is not entitled to coverage. *See Hoskins v. Aetna Life Ins. Co.,* 6 Ohio St. 3d 272, 452 N.E. 2d 1315, 1315 (Ohio 1983). Thus, the test is not whether Defendants reached the correct conclusion in denying Dr. Shah certain benefits, "but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial." *Thomas v. Allstate Ins. Co.,* 974 F.2d 706, 711 (6th Cir. 1992).

For the bad faith claim at issue in this case, the Defendants need only demonstrate they were reasonably justified in determining Dr. Shah was disabled due to "sickness" and not "injury." "[T]o grant a motion for summary judgment brought by an insurer on the issue of whether it lacked good faith in the satisfaction of an insured's claim, a court must find after viewing the evidence in a light most favorable to the insured, that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Son v. Midwestern Indem. Co.*, 65 Ohio St. 3d 621, 630, 605 N.E.2d 936, 943 (1992) (overruled on other grounds by *Zoppo,* 71 Ohio St. 3d 552, 644 N.E.2d 397)). In *Tokles,*

8

the Supreme Court of Ohio used the "fairly debatable test" to determine what constitutes "reasonable justification" in denying a claim. To survive a motion for summary judgment on a bad faith claim, the insured must provide evidence "which tends to show that the insurer had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification for refusing the claim." *Id.*

Dr. Shah argues that Defendants cannot rely on the reasonable justification standard outlined in *Zoppo* and its progeny, because that standard does not relieve Defendants of their obligation to "thoroughly and fairly investigate, process and evaluate the insured's claim." (Pl.'s Resp. Opp. Defs.' Mot. Partial Summ. J. 2, ECF No. 80 at 5824). While the Court does not disagree with this proposition, the Court also finds that Defendants did exactly that. Defendants commissioned several medical evaluations, including discussions with Dr. Shah's treating physicians, and asked their in-house counsel to ascertain the status of Ohio law concerning Dr. Shah's claims.

Dr. Shah asserts his "injuries" are multi-factorial and attributed to both his work as an interventional cardiologist and his bicycle fall. (*Id.* at 5858). Dr. Shah further contends that Defendants lacked reasonable justification in denying his disability claim due to "injury," because their investigation into his disability claim was both biased and inadequate. (*Id.* at 5823). Specifically, Dr. Shah alleges that Defendants: (1) ignored medical evidence supporting his claim, including his broken clavicle; (2) rejected the opinion of their own retained expert, Dr. Ahn, who told Defendants that Dr. Shah's problems came from the broken clavicle and (3) cherry-picked evidence using language that does not even appear in the insurance policy, such that his disability must be from "an acute traumatic injury." (*Id.*).

9

## A. Evidence of "Injury"

Dr. Shah insists that Defendants ignored key evidence supporting an "injury" determination. Conversely, Defendants maintain they focused their analysis of Dr. Shah's claim on the occupational hazards of his field by examining the cumulative effects of his work in a catherization lab, whether Ohio law recognizes damage from repetitive stress as an "accidental bodily injury," and the effects of Dr. Shah's broken clavicle on his disabling condition. (ECF No. 81 at 5849–50). Defendants specifically point to Dr. Beavers' discussion with Dr. Nowinski concerning a potential work-related injury, the separate report generated by Dr. Kanovsky following the physicians' differing conclusions, the legal research conducted by their in-house counsel, and the notes from Dr. Shah's follow-up examinations with Dr. Nowinski after his clavicle repair as evidence they adequately addressed Dr. Shah's concerns from both the medical and legal perspective. (*Id.*).

Defendants aver they did not ignore Dr. Shah's broken clavicle but reasonably interpreted it had healed based on Dr. Shah's follow-up visits with Dr. Nowinski, where Dr. Nowinski twice described Dr. Shah's clavicle as "well healed." (ECF No. 62-11 at 5479; ECF No. 62-12 at 5483). When Dr. Nowinski later opined that Dr. Shah's injury was due to "injury," Defendants sought further review of Dr. Shah's medical records from Dr. Kanovsky, who concluded Dr. Shah's condition was not "traumatic or injurious." (ECF No. 62-25). When Dr. Shah later appealed Defendants' initial determination of his claim, Defendants pursued the opinion of yet another physician, Dr. Moses, who confirmed Dr. Shah's condition was due to degenerative changes. (ECF No. 62-29). Though Defendants' ultimate determination of Dr. Shah's claim is at odds with Dr. Nowinski's assertion that Dr. Shah's condition was related to an "injury," the Court finds that Dr. Shah has failed to produce evidence from which a jury could reasonably find that Defendants

ignored Dr. Nowinski's assessments of Dr. Shah (as reflected in both the medical records he prepared and in his sworn declaration).

**B. Dr. Ahn**

Dr. Shah also claims Defendants rejected the opinion of their own retained expert, Dr. Ahn. (ECF No. 80 at 5839–40). In his first two reports, Dr. Ahn, opined that "[c]learly, [Dr. Shah]'s disability would qualify as sickness as opposed to injury since his condition is a degenerative one that occurred over the course of many years and which is largely age-related." (August 7, 2017 Report, Ex. A, ECF No. 54-1 at 564; September 5, 2017 Report, Ex. B, ECF No. 54-2 at 569).

On January 15, 2018, Dr. Ahn examined Dr. Shah for a third time and concluded:

> [Dr. Shah]'s disability could qualify as an injury since the majority of the present symptoms appear to be related to the area in which the clavicle fracture was incurred, and this was clearly a traumatic event. It should be noted however, that the tenderness identified during the course of the examination is purely subjective. No objective findings were identifiable that would demonstrate that physiologically the patient would not be able to perform the activities required as an interventional cardiologist.

(January 15, 2018 Report, Ex. C, ECF No. 54-3 at 575).

Dr. Shah maintains that Defendants continue to exercise bad faith regarding his claim by refuting the opinion of their own expert, Dr. Ahn. (ECF No. 80 at 5839–40). In contrast, Defendants argue that Dr. Shah cannot rely on post-litigation conduct to prove bad faith in the denial of his claim three-to-four years beforehand. (ECF No. 81 at 5852). Each party points to *Spadafore v. Blue Shield, Ohio Med. Indem. Corp.*, 21 Ohio App. 3d 201, 486 N.E.2d 1201 (1985) to highlight its contention.

In *Spadafore,* the court reasoned, "evidence of the breach of the insurer's duty to exercise good faith occurring after the time of filing suit is relevant so long as the evidence related to the bad faith or handling or refusal to pay the claim." *Id.* at 204, 1204. Dr. Ahn's third report does not relate to the Defendants' handling or refusal to pay Dr. Shah's claim. Instead, it is a further

11

consideration of his own prior opinions in which he acknowledges the possibility of a link between the clavicle fracture and Dr. Shah's condition but expressly notes the absence of objective findings to prove the connection. While Dr. Ahn's third report diverges from his earlier assessments, it did not inform the Defendants' processing of Dr. Shah's claim, because the third report was issued well after their 2014–2015 determination.

In assessing Dr. Shah's claim of bad faith, the Court must analyze the information Defendants relied on in making their coverage determination to conclude if Defendants were reasonably justified in doing so. Here, it is inappropriate for the Court to accord any weight to Dr. Ahn's 2018 opinion in relation to Dr. Shah's assertion that the Defendants breached their duty of good faith in their 2014–2015 determination. Dr. Ahn's third report was not available at the time Defendants handled his claim. While such evidence may be more probative of the mercurial nature of Dr. Ahn's conclusions, it is not entitled to consideration in the Court's bad faith analysis.

### C. Acute Traumatic Injury

The core issue in this case is whether Dr. Shah's disabling condition was caused by "sickness" or "injury." The Policy at issue defines "injury" as an "accidental bodily injury sustained after the Date of Issuance and while Your Policy is in force," but does not define "accidental bodily injury." (Claim File, ECF No.57-1 at 784, ¶ 1.5). In processing Dr. Shah's claim, Defendants used "acute traumatic event" to interpret the phrase "accidental bodily injury." (ECF No. 81 at 5846). Dr. Shah contends that this language is not contained in the Policy, and by cherry-picking such language, Defendants' interpretation of the Policy was arbitrary and capricious, and their ultimate benefits determination lacked reasonable justification. (ECF No. 80 at 5834).

The question here is not whether Defendants correctly interpreted the phrase "accidental bodily injury," but whether such interpretation was reasonably justified. Defendants rely on a California case to support their assertion that they did not commit bad faith when they relied on the plain meaning of "accidental bodily injury" to exclude a disability resulting from Dr. Shah's profession. (ECF No. 81 at 5855). In Defendants' supporting case, the insured doctor sued his insurance company after the company determined his occupational injury was not considered an "accidental bodily injury." *Bilezikjian v. Unum Life Ins. Co. of Am.*, 692 F. Supp. 2d 1203, 1204 (C.D. Cal. 2010). The district court determined the plaintiff's injury was not an "accidental bodily injury," because such an injury "required a sudden event causing injury." *Id.* The court further reasoned that "no one 'intends' to become disabled, and allowing recovery for a disability caused by routine, work-related activities would render the term 'accidental' meaningless for insurance purposes." *Id.* at 1216 (quoting *Gin v. Penn. Life Ins. Co.,* 134 Cal. App. 4th 439, 36 Cal. Rptr. 3d 571 (2005)). After discussing the plaintiff's gradual development of his disabling condition over the course of many years while working as an orthopedic surgeon, and such condition ultimately preventing him from continuing to practice medicine, the district count emphasized that no sudden event triggered his disabling condition. *Id.* at 1223. As such, the court did not consider the plaintiff's disability an "accidental bodily injury." *Id.*

Defendants also rely on Michigan case law to further their point. Similar to this case, the policy at issue in the Michigan case defined "injuries" as "accidental bodily injuries occurring while your policy is in force," and "sickness" as "sickness or disease which is first manifested while your policy is in force" while providing no further definition of "accidental bodily injuries." *Nehra v. Provident Life & Accident Ins. Co.*, 454 Mich. 110, 112 559 N.W.2d 48, 50 (1997). In that case, the Supreme Court of Michigan did not consider a dentist's occupational injury to be an

13

"accidental bodily injury" under the applicable policy due to the lack of "an injury sustained in a single accident, having a temporal and spatial location." *Id.* at 114, 52. Like the California district court, the Supreme Court of Michigan emphasized, "[w]ithout the temporal/spatial component, the word 'accidental' adds almost nothing to the phrase 'accidental bodily injuries,'" and "[i]f 'accidental' injury can occur naturally over a long period of time, then the only injuries that are not accidental are those that are intentionally inflicted." *Id.* at 118.

While the Court may be aided by decisions in other jurisdictions, under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938), the Court applies Ohio law to determine whether Defendants were reasonably justified in their use of "acute traumatic event" to interpret the phrase "accidental bodily injury." Defendants submit that their in-house counsel located three Ohio cases supporting the conclusion reached by the California district court and the Supreme Court of Michigan that "accidental bodily injury" requires a specific temporal event. (ECF No. 62-26 citing *Burns v. Employers' Liab. Assurance Corp.,* 134 Ohio St. 222, 16 N.E.2d 316 (1938); *Bond v. Bhd. of Locomotive Firemen & Enginemen,* CASE NO. CA84-02-015, 1984 Ohio App. LEXIS 10675 (Ct. App. Aug. 20, 1984); *Hammer v. Mutual Ben. Health & Acci. Ass'n,* 158 Ohio St. 394, 109 N.E.2d 649 (1952). The first two cases rely on the Ohio definition of "accident" as, "[a]n accident is considered as an event proceeding from an unexpected happening or unknown cause without design, and not within the usual course of things." *Burns,* 16 N.E.2d at 317; *Bond,* 1984 Ohio App. LEXIS 10675, at *5. In the third case, *Hammer,* the Supreme Court of Ohio considered the following comment regarding the decedent's condition as pertinent, "not the usual happening under such circumstances in the common experience of men; but contained very forcibly and violently the elements of something unforeseen, unexpected and out of the ordinary course." 109 N.E.2d at 651.

14

Upon reviewing the cases provided by Defendants, the Court finds Dr. Shah has failed to produce evidence from which a jury could reasonably find that Defendants were not reasonably justified in using "acute traumatic event" to interpret the phrase "accidental bodily injury." The word "acute" signifies a severe, rapid onset, and "traumatic" indicates an injury-causing event. *See Oxford English Dictionary* (3d ed. 2011). The phrase "acute traumatic event" is sufficiently related to "accidental bodily injury" and the applicable case law, and its use by Defendants does not show a lack of good faith. Moreover, Dr. Shah cannot demonstrate that Defendants' use of "acute traumatic event" to interpret "accidental bodily injury" is significant to this case. Defendants did not find that the broken clavicle fell outside of the definition of "accidental bodily injury," but instead determined Dr. Shah's disability was due to a degenerative occupational condition and not his broken clavicle.

Both parties also highlight this Court's decision in *Smith v. Great-West Life Assurance Co.*, No. 2:09-CV-0955, 2012 U.S. Dist. LEXIS 45559 (S.D. Ohio Mar. 30, 2012) as determinative, but for differing reasons. Dr. Shah contends this Court denied summary judgment because of the insurer's unreasonable interpretation of "disease" or "sickness" and analogized to Defendants' purported subjective definition of "injury" in this case. (ECF No. 80 at 5835). Defendants counter that this Court denied summary judgment for an entirely different reason, that the insurer changed its position throughout the terms of the policy. (ECF No. 81 at 5856). The Court agrees with the Defendants' reading of this case and determines that this Court found no issue with the insurer's erroneous, but reasonable interpretation of the term "disease" or "sickness" in the *Smith* case. 2012 U.S. Dist. LEXIS 45559 at *20. As Dr. Shah has not presented evidence from which a reasonable jury could find that Defendants changed their position throughout the terms of his Policy, *Smith*

bears no applicable analogy. Therefore, the Court does not find this case as determinative for the motion at bar.

## IV. Conclusion

Whether Defendants correctly interpreted Dr. Shah's Policy remains at issue and for later resolution. Concerning the present motion, this Court finds that Dr. Shah has failed to produce evidence from which a jury could reasonably find that Defendants lacked good faith in processing his claim. There remains no genuine dispute of material fact that Defendants demonstrated good faith and were reasonably justified in determining Dr. Shah's disability was due to "sickness" and not "injury." That conclusion is fairly debatable, and Defendants' refusal was premised on both the status of the law at the time of the denial and the facts that gave rise to Dr. Shah's disability claim.

Defendants' motion (ECF No. 61) is therefore **GRANTED**. Accordingly, Plaintiff's claim for bad faith is **DISMISSED**. Defendants further contend that because Dr. Shah's related claims for punitive damages and attorneys' fees require a showing of bad faith, his accompanying claims for punitive damages and attorneys' fees should also be dismissed. *Thomas,* 974 F.2d at 712 n.6 ("Because no bad faith was shown . . . claim for punitive damages was properly denied."). As Dr. Shah's claim of bad faith lacks merit, his related claims for punitive damages and attorneys' fees are also **DISMISSED**.

**IT IS SO ORDERED.**

/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: February 19, 2019